## STATE *v.* VAUGHAN.

### Opinion delivered December 10, 1906.

1. GAMING—BETTING ON HORSE RACING is not gaming within Kirby's Digest, § 1740, providing that it shall be an offense to bet "any money or any valuable thing on any game of hazard or skill." (Page 120.)

2. NUISANCE—TURF EXCHANGE.—A turf exchange or pool room wherein money is received, won and lost on horse races, where tickets for pools on horse races to be held in this State and elsewhere are bought, sold and cashed, where fifteen to thirty persons daily congregate for the purpose of buying, selling or cashing pools on the races, is a nuisance at common law. (Page 121.)

3. SAME—INJUNCTION.—Injunction will not lie at the instance of the State to restrain an indictable public nuisance, unless the nuisance is one touching civil property rights or privileges of the public, or the public health is affected thereby, or some other ground of equity jurisdiction exists calling for the injunction. (Page 126.)

4. SAME—INJUNCTION AGAINST POOL ROOM.—An injunction will not lie at the instance of the State to restrain as a nuisance the maintenance of a pool room. (Page 126.)

5. JURY TRIAL—RIGHT TO.—Persons charged with crime are entitled to jury trial, which right can not be taken from them under guise of an injunction against a nuisance. (Page 127.)

Appeal from Pulaski Chancery Court; *Jesse C. Hart,* Judge; affirmed.

*Robert L. Rogers,* Attorney General, *Lewis H. Rhoton,* Prosecuting Attorney, *Bert Brooks,* City Attorney of Little Rock, and *W. E. Atkinson,* for appellants.

1. Poolrooms and turf exchange are gaming houses, and are *per se* common public nuisances. 51 N. J. L. 387; 30 Ark. 428; 79 Ky. 361; 39 Fla. 441; 55 Pa. St. 294; 58 Ark. 82; 51 Mich. 203; 51 Cal. 78; 16 Minn. 209; 60 N. H. 73; 2 Ky. L. R. 339; 98 Ky. 635; 80 Pac. 877.

Book-making is a gaming device or gaming table within the meaning of the law. 6 App. Cas. (D. C.), 6; 98 Ky. 576.

2. Courts of equity have undoubted jurisdiction to enjoin public nuisances. 2 Story, Eq. Jur. § 921; 4 Pomeroy's Eq. Jur. § 1349; Wood on Nuisance, (3 Ed.), § 819; Bispham on Eq. § 439; 18 B. M. 800; 23 Ky. L. R. 1744; 25 *Id.* 411. That the criminal courts may punish those who maintain a public nuisance does not affect the right of equity to interfere by injunction. 21 Am. & Eng. Enc. Law, 703; 52 L. R. A. 279; 143 Ind. 98; 28 Kan. 726; 66 N. H. 39; 158 U. S. 564; 65 Ia. 488; 84 Ala. 115; 46 L. R. A. 533; 18 L. R. A. 646; 116 Cal. 397; 76 Pac. 513; 99 N. W. 249; 11 Md. 128; 128 N. Y. 341; 37 Mo. 214; 22 Ala. 190; 61 L. R. A. 150; 30 Ga. 506.

3. The authority of the Attorney General to bring the suit is not statutory, but derived from the common law, and is generally recognized. L. R. 21 Ch. Div. 752; 3 McN. & Gor. 453; 25 Ky. L. R. 411; 1 B. M. 215; 6 B. M. 397; 69 N. Y. Sup. 383; 59 Mass. 336; Eden on Inj. § 259; 19 Pet. 91; 118 Cal. 234; 26 N. Y. 293; 108 Mass. 436.

*J. W. & M. House,* for appellees.

1. Betting on a horse race, where it is what is called a turf race, is not gambling, nor a violation of the law. 23 Ark. 726; 58 Ark. 79. Selling pools on horse races or betting on same is not an offense under our statute nor at common law. 15 Ark. 71; *Ib.* 259; 63 Md. 242; 46 Am. Dec. 97; 58 *Id.* 94; Kirby's Digest, § § 1807, 1809, 2036, 2040, 3687, 3688, 3689; 18 Ark. 570; 79 Ky. 359; 1 Morris (Ia.), 169; 46 Mo. 375; 31 Mo. 35; 8 Gratt. (Va.), 292; 33 Ala. 433; 63 Md. 242; 4 Har. (Del.), 308.

2. An injunction will not as a rule lie where there is a plain remedy at law, or by criminal prosecution. The mere fact that the law is against gambling, even if it be conceded that the keeping of a poolroom is keeping a gambling house, is no ground for the interposition of a court of equity. 2 Beach on Inj. 1087-9; High on Inj. 23; 37 S. W. 478: 36 S. W. 1106; 2 Wood on Nuisances, § § 788, 791; 34 L. R. A. 95. See, also, 34 L. R. A. 95; 2 John. Ch. 374; 37 S. W. 478; 46 L. R. A. 850; 42 Am. Rep. 182; 45 S. W. 506; 52 L. R. A. 299. When the remedy at law is complete, equity will not grant relief. 7 Ark. 20; 13 Ark. 630; 26 Ark. 649; 27 Ark. 97; 27 Ark. 157; 48 Ark. 331; 14 Ark. 339. See, also, 1 Bishop's Crim. Proc. § 1417; 141 N. Y. 237; 42 Wis. 609; 59 Ga. 790; 102 Ill. App. 449; 58 Pac. 605; 99 Wis. 213.

3. In this case the remedy at law was complete. The cities of Little Rock and Argenta each had the power, under its charter, to suppress a nuisance. Kirby's Digest, § 5438. If the running of a poolroom was keeping a gambling house or a common nuisance, the defendants were liable to indictment and punishment, and the whole police power of the State could have been called upon to suppress it. Kirby's Digest, § § 2464, 7769; 124 U. S. 200; 25 Ark. 301.

HILL, C. J. The Attorney General of Arkansas, the Prosecuting Attorney of the Sixth Judicial Circuit, and the Mayor and City Attorney of Little Rock brought a bill in chancery against Vaughan, Furth, Faucette and others, in the name of the State of Arkansas and the City of Little Rock, seeking to enjoin Furth from operating a pool room at a place in the city of Argenta near the Free Bridge which connects Argenta and Little Rock, and that the other defendants be enjoined from permitting or assisting, in the several ways alleged, said Furth in conducting said pool room. The defendants answered, denying many allegations of the bill, and to this answer the State and city demurred, and the case was determined on the demurrer, the court sustaining it, and the State and city rested upon it and appealed. The review here is limited to the admissions and allegations in the answer and the undenied allegations of the complaint, as all other allegations were eliminated by trying the case on the sufficiency of the an-

swer. The material parts of the answer, aside from its denial of the allegations of the complaint, are as follows:

"It is true that the defendant, Bob Furth, operated what is known as a turf exchange or pool room, where money is received, won and lost on horse races, and where tickets for pools on horse races run, or to be run, at various and divers racecourses in the State of Arkansas and throughout the United States, are bought, sold and cashed." "That in point of fact there are not more than fifteen or thirty people who visit said turf exchange daily, and that neither women nor children are permitted in said pool room or turf exchange. And they state that said pool room or turf exchange is conducted as a quiet, orderly business, and that no persons visit the same except those who desire to do so, and that disorderly or dissolute characters are not allowed or permitted to visit there, and are not in the habit of doing so. It is true that he has caused the said turf exchange to be advertised by a short notice in one of the Little Rock papers, and that he has at times operated a carriage from said city of Little Rock to said pool room. That the business only attracts such as desire to purchase tickets or pools on horse races, and that disorderly or lewd women or the lawbreaking class are not in the habit of attending said pool room or turf exchange. And that no one is disturbed by the gathering of the people in or about said premises. They further state that the city of Little Rock has no corporate property whatever that is in any way affected by the alleged public nuisance as described in said complaint. They further state that the State of Arkansas has no property interest in the matters complained of, and that, if the said defendants are violating any law, the criminal courts of the State have ample power and authority to prosecute the defendants for such offenses, and that the charter of the city of Argenta authorizes said city to punish or abate a nuisance carried on as alleged in the complaint."

The first question under inquiry is whether betting on horse-racing is gambling within the meaning of the statutes against gaming.

The general statute, the only one of them under which it could fall, defines the act therein made criminal to be "betting any money or any valuable thing on any game of hazard or

skill." Kirby's Digest, § 1740. It contemplates that the game be "played," for the next section provides that it shall not be necessary for the indictment to allege with whom the game was played. Sec. 1741. In construing these statutes in 1861 Chief Justice ENGLISH for this court said: "But we do not think the Legislature intended to embrace horse-racing by the words 'any game of hazard or skill' 'played,' etc., however vicious such sports may be." *State* v. *Rorie,* 23 Ark. 726. In 1893 this court had before it betting on a game of baseball, and it was held to be criminal because on a game of skill, and the distinction that horse-racing was not a game but a sport was approved. *Mace* v. *State,* 58 Ark. 79. Some States sustain this distinction, and hold horse-racing to be a sport and not a game, within the gaming statutes, but the weight of authority is to the contrary. 20 Cyc. 884; 14 Am. & Eng. Enc. Law, p. 682. It will not do to overrule *State* v. *Rorie* merely because against the weight of authority; there is good reason to sustain the distinction therein made, and it has been acquiesced in by the State for 45 years, when at any time it could have been changed by legislation. Therefore it must be taken in this case that betting on horse-racing is not a crime of itself.

The quoted parts of the answer admit the maintenance by Furth of a turf exchange or pool room, wherein money is received, won and lost on horse races, where tickets for pools on horse races run or to be run in Arkansas and elsewhere are bought, sold and cashed; that fifteen to thirty persons daily visit the pool room for the purpose of betting on the races or buying, selling or cashing pools on the races; that said business is advertised, and at times a vehicle to bring patrons to it has been furnished.

What is the status of such a house, notwithstanding it is conducted in a quiet and orderly manner without unusual noise or disorderly conduct? At common law there were no statutes against gaming, yet the maintenance of a gaming house was a criminal nuisance, indictable and punishable as such. Mr. Justice SCOTT for this court said: "Independent of any statute, the keeping of a common gaming house is indictable at common law on account of its tendency to bring together disorderly persons, promote immorality and lead to breaches of the peace.

Such an establishment is thus a common nuisance." *Vande-worker* v. *State,* 13 Ark. 700. Chief Justice WATKINS for this court said:

"At common law, gaming houses were indictable as a public nuisance (*Vandeworker* v. *State,* 13 Ark. 700), but unless restrained by express statute ordinary wagers or betting were tolerated as being for amusement or recreation." *Norton* v. *State,* 15 Ark. 71.

In *Thatcher* v. *State,* 48 Ark. 60, the court went into the subject of gaming, bawdy and disorderly houses being common-law nuisances, and held that they were such, not from the noise or disorder, but on account of the evil tendency of the business there conducted. Mr. Wharton says: "It is at common law not indictable for persons to engage in gaming in private, or to conduct a single game of chance in public. But when gaming is there publicly known to be carried on, however secluded the place may be, and when unwary and inexperienced persons are there enticed and fleeced, then the parties concerned are indictable for nuisance, irrespective of any particular statutes." 2 Wharton, Crim. Law, § 1465.

Mr. Bishop says a common gaming house is a nuisance because those attracted to it, especially youths, are there lured to vice, and youths may be as effectually lured by a noiseless process as by any other. 1 Bishop, Crim. Law §§ 1135, 1136. Therefore it follows that the fact that betting on horse-racing is not within the gaming statutes does not prevent a house maintained for such betting being a criminal nuisance. As seen, the evil character of the business, and not the violation of express statutes, is what stamps it as a nuisance.

Turning more directly to the case in hand, do pool rooms fall within the definition of common-law nuisances, whether the games or sports bet upon are contrary to statute or not?

Judge Cooley, speaking for the Michigan court, drew a vivid picture of the evils of betting, and showed that, even where individual wagers were tolerated by law, a house maintained to carry on a betting business was unlawful. *People* v. *Weithoff,* 51 Mich. 203. The case of *State* v. *Nease,* 80 Pac. (Ore.), 897, is much in point, as these excerpts will show: "The evidence shows that he (the defendant) was the keeper and proprieter of

what is called a 'turf exchange' or poolroom on one of the prin-
cipal thoroughfares of the city, at which persons daily congregate
for the purpose of betting upon horse races run in other States
and repeated to him by telegraph.  *  *  *  That such a house
is a gaming or gambling house, and punishable as a nuisance
at common law, whether betting on a horse race is a crime or
not, has so often and uniformly been held by the courts that it is
no longer open to discussion.   There is no dissent in the adjudged
cases, and it is unnecessary to do more than cite the author-
ities."  (Citing many cases.)   See, also, 20 Cyc. p. 893, 894,
notes.   The foregoing question must be answered affirmatively.

The common law is put in force in this State, and the punish-
ment for common-law offenses not covered by statute is fixed as
a fine not exceeding $100 and imprisonment not to exceed three
months.   Kirby's Digest, § § 623 and 624.

These statutes have been held applicable to a gaming house
as a common-law misdemeanor.  *Vandewoker* v. *State,* 13 Ark.
700; *Norton* v. *State,* 15 Ark. 71; *Thatcher* v. *State,* 48 Ark.
60;  1 Bishop, Crim. Law, § 1137.  Each period in which a
nuisance continues is a separate offense.  Wharton, Crim. Law.
§ 1419.

In addition to proceeding by fine and imprisonment, the
State may have a judgment abating the nuisance and execution
therefor.  Wharton, Crim. Law, § 1426; Bishop, Crim. Law, §
1179; Kirby's Digest, § 2464.

The court has gone fully into the question of the criminality
of maintaining a poolroom and the remedies therefor, in order to
ascertain whether a chancery court by injunction can restrain a
person or persons from carrying on such business.

There are some courts of learning and ability holding that
common-law nuisances, such as illegal tippling houses, disorderly
houses, bawdy houses and gaming houses, may be restrained by
injunction.  These cases go back to *State* v. *Crawford,* 28 Kan.
726, s. c. 42 Am. Rep. 182, in which it was held that an illegal
drinking saloon (one run counter to a prohibition law of the
State) could be closed by injunction, although in that particular
case it was not done, on account of the sufficiency of a statutory
remedy reaching the evil.  Mr. Justice Valentine thus stated
and commented upon the case:  "This action was originally in-

stituted in the district court of Shawnee County by the county attorney of such county, in the name of the State, for the purpose of perpetually enjoining the further continuance of an illegal liquor saloon, in which intoxicating liquors were illegally, continuously and persistently sold to be drunk on the premises as a beverage. * * * It must be admitted that this is a rare proceeding—so much so as to startle old and experienced practitioners, and yet, if it were ascertained, after a careful examination of all its elements, to be founded in reason and justice, and to come within the principles of long established equity jurisprudence, it should not be dismissed unceremoniously, or denied a respectful hearing, simply because of its unquestioned and admitted novelty." Then the learned Justice plausibly contends that such an use of the injunction accords with the principle of equity jurisprudence. See *State* ex rel. *Rhodes* v. *Saunders* (N. H.), 18 L. R. A. 646, and *Weakley* v. *Page* (Tenn.), 46 L. R. A. 552, where cases supporting this view are reviewed, and other cases along the same line may be found in appellant's brief. The same question came before the St. Louis Court of Appeals when Seymour D. Thompson was a member of that court, and that able jurist delivered an opinion completely answering the contention of the Kansas court in the Crawford case. He showed by authority and reason that the jurisdiction in courts of equity to restrain public nuisances was limited to these three classes:

1. To restrain purpresture of public highways or navigation.

2. To restrain threatened nuisances dangerous to the health of a community.

3. To restrain *ultra vires* acts of corporations injurious to public right.

The court proceeds: "Unquestionably, the exercise of equity jurisprudence in these three classes of cases is an exception to a very general, well-understood, and important rule. That rule is, that a court of equity has no jurisdiction in matters of crime. In these three classes of cases jurisdiction is, however, exercised for special reasons, although unquestionably the nuisance complained of is a misdemeanor and subject to prosecution by indictment." *State* v. *Uhrig*, 14 Mo. App. 413. Chancellor Kent said: "If the charge be of a criminal nature, or an

offense against the public, and does not touch the enjoyment of property, it ought not to be brought within the direct jurisdiction of this court (a chancery court), which was intended to deal only in matters of civil right resting in equity, or where the remedy at law was not sufficiently adequate. * * * I know that the court is in the practice of restraining private nuisances to property, and of quieting persons in the enjoyment of private rights; but it is an extremely rare case, and may be considered, if it ever happened, as an anomaly, for a court of equity to interfere at all, and much less preliminarily by injunction, to put down a nuisance which did not violate the rights of property, but only contravened the general policy." *Atty. Genl.* v. *Utica Ins. Co.,* 2 Johns. Ch. 371.

The Illinois court said: "It is elementary law that the subject-matter of the jurisdiction of the court of chancery is civil property. * * * The court has no jurisdiction in matters merely criminal or merely immoral, which do not affect any right to property." *Sheridan* v. *Colvin,* 78 Ill. 237. Again it is well said: "It is no part of the mission of equity to administer the criminal law of the State or to enforce the principles of religion or morality, except so far as the same may be incidental to the enforcement of property rights, and perhaps other matters of equitable cognizance." *Cope* v. *Fair Assn.,* 99 Ill. 489. In *People* v. *Condon,* 102 Ill. App. 449, the subject of equity jurisdiction to enjoin a pooling and betting business was gone into fully and the authorities reviewed, and the result thus summed up: "1. That a court of equity has no jurisdiction over matters merely criminal or merely immoral. 2. That a court of equity will sometimes enjoin a public nuisance. 3. That this will be done in no case where the State is the complainant, unless it be clearly shown that such nuisance affects public property or public civil rights." A learned text writer, whose works are standard authorities, says: "Nuisances that arise from the acts of men that, for the time being, make the property devoted to their purposes a nuisance, but which cease to be so when the use is stopped: such as disorderly houses, gaming houses and cockpits, that are *malum in se* and common nuisances purely, and only punishable by indictment." 1 Wood on Nuisances, § 14.

The Supreme Court of the United States considered the use

of the injunction to restrain public nuisances and preserving rights of the public in highways when the Government secured an injunction against strikers interfering with interstate mail and traffic at Chicago in the railroad strike of 1894, and Mr. Justice Brewer, speaking for an undivided court, said: "The difference between a public nuisance and a private nuisance is that cne affects the public at large and the other only the individual. The quality of the wrong is the same, and the jurisdiction of the courts over them rests upon the same principles and goes to the same extent. * * * Again, it is objected that it is outside of the jurisdiction of a court of equity to enjoin the commission of crimes. This, as a general proposition, is unquestioned. A chancellor has no criminal jurisdiction. Something more than the threatened commission of an offense against the law of the land is necessary to call into exercise the injunctive powers of the court. There must be some interferences, actual or threatened, with property or rights of a pecuniary nature; but when such interferences appear, the jurisdiction of a court of equity arises, and is not destroyed by the fact that they were accompanied by, or are themselves, violations of the criminal law." In re *Debs,* 158 U. S. 564, 592, 593.

It is demonstrably true that it is a sound principle of equity jurisprudence that an injunction will not lie at the instance of the State to restrain a public nuisance where the nuisance is one arising from the illegal, immoral or pernicious acts of men which for the time being make the property devoted to such use a nuisance, where such nuisance is indictable and punishable under the criminal law. On the other hand, if the public nuisance is one touching civil property rights or privileges of the public, or the public health is affected by a physical nuisance, or if any other ground of equity jurisdiction exists calling for an injunction, a chancery court will enjoin, notwithstanding the act enjoined may also be a crime. The criminality of the act will neither give nor oust jurisdiction in chancery. Applying these principles here, it is seen that the admissions of the answer prove Furth to have been daily violating the criminal laws, but there is an absence of any showing that the acts constituting the crime reached to any of the grounds of equity jurisdiction. In some cases where the jurisdiction of equity is sought to restrain a criminal nuisance,

there are allegations that the criminal processes are inadequate to afford relief from connivance of the officers or other reasons. Happily, that unfortunate situation is not presented here; the prosecuting attorney joins in this complaint, and allegations involving the officers of Argenta in the maintenance of this poolroom were denied in the answer, and the State elected to treat the answer as true. It is not only the right, but the sworn duty, of every prosecuting attorney to proceed by information in justice's or circuit court to close these illegal places when they have information of them; it is not only the right but the duty of every grand jury to find the existence of such places if they exist and to indict the keepers thereof. It is also the privilege of any citizen to proceed against them at any time by affidavit before a justice of the peace.

There is no possible excuse under the law for a poolroom—a place maintained for carrying on or facilitating betting on horse races or any other sport or game or contest or other event upon which wagers are laid—to exist in Arkansas for one minute. Its maintenance is a crime, nothing more, nothing less.

Persons charged with crime are entitled to a jury trial, and this right must not be taken from them under guise of an injunction against a nuisance.

The chancellor was right in refusing to entertain jurisdiction, and the judgment is affirmed.